UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| J.D.O., a minor, by and through her mother and natural guardian, Amber C. Oldenburg,<br><br>Plaintiff,<br><br>v.<br><br>The Gymboree Corporation, Gymboree Retail Stores, Inc., Gymboree Operations, Inc.,<br><br>Defendants. | Case No. 12-cv-71 (SRN/JSM)<br><br>**MEMORANDUM OPINION AND ORDER** |

David M. Bolt and Christopher J. Hoffer, Bolt & Hoffer Law Firm, 3340 Northdale Boulevard NW, Suite 130, Coon Rapids, Minnesota 55448; Alan E. Fredregill, Heidman Law Firm LLP, 1128 Historic Fourth Street, P.O. Box 3086, Sioux City, Iowa 51102, for Plaintiff.

Miranda J. Welbourne and Scott D. Feringa, Sullivan Ward Asher & Patton P.C., 25800 Northwestern Highway, Suite 1000, Southfield, Michigan 48075; Gary J. Gordon, McCollum, Crowley, Moschet, Miller & Laak, 7900 Xerxes Avenue South, Suite 700, Minneapolis, Minnesota 55431, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.  INTRODUCTION

In this diversity case, Plaintiff seeks to recover for severe burn injuries sustained by J.D.O., a minor, when her dress, designed and sold by Defendants, caught fire from contact with a lit candle in her home. Plaintiff alleges that the dress was defective because of its specific ignition and flame spread characteristics, and because it lacked any warning about

its high degree of flammability. Plaintiff sued Defendants on theories of strict liability, negligence, and breach of warranty. This matter is now before the Court on Defendants' motion for summary judgment [Doc. No. 23]. For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## II. BACKGROUND

On February 26, 2008 at approximately 4:00 p.m., then-three year old J.D.O. was at her apartment watching television with her younger sister. J.D.O.'s mother, Amber Oldenburg ("Ms. Oldenburg"), was working at the kitchen table with a votive candle burning. (Dep. of Amber Oldenburg at 8-9, Ex. A to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-1].) Ms. Oldenburg left the kitchen to use the bathroom, where she was briefly before she heard screaming. (Id. at 40.) She ran into the hallway and saw J.D.O. running toward her; J.D.O.'s dress was in flames. (Id. at 40-41.) Ms. Oldenburg rolled J.D.O. on the floor to extinguish the fire. (Id. at 46.) She then took J.D.O. to the bathroom, put her in the bathtub, and let the shower run on J.D.O. (Id. at 46, 67.) Pieces of J.D.O.'s dress fell off in the bathtub. (Id. at 58, 67.)

Ms. Oldenburg called 911. (Oldenburg Dep. at 68.) When members of the police and fire department arrived, J.D.O. was standing naked in the hallway, silent. (Id. at 68-69.) They transported J.D.O. to Hennepin County Medical Center. (Id. at 72.) J.D.O. had second- and third-degree burns over 50% to 60% of her body—mostly to her chest, arms, and neck. Six months later, J.D.O. was discharged from the hospital and began one to two months of therapy at Shriners Hospital for Children in Cincinnati, Ohio. (Id. at 81.) J.D.O. continues to visit Shriners Hospital every few months for checkups. (Id. at 100.)

J.D.O.'s dress was designed and sold by Defendants. The brown animal print shell was 99% cotton, and the lining was 100% cotton. (Oldenburg Dep. at 91.) J.D.O.'s grandmother purchased it at a Gymboree in Maple Grove, Minnesota as a gift for J.D.O. (Id. at 88; Aff. of Cynthia Oxley ¶ 2, Ex. L to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].) A tag sewn into the dress read, "Not Intended for Sleepwear." (Compl. ¶ 18 [Doc. No. 1].)

Defendants hired a Hong Kong company, Bureau Veritas, to conduct pre-manufacture fabric testing. These tests purportedly show that the shell fabric failed on "dimensional stability" and "tear strengths." (Bureau Veritas Results, Ex. O to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-6].) The shell and lining met the governmental flammability standard for retail apparel under 16 C.F.R. § 1610 (Commercial Standard 191-53).

### III. DISCUSSION

#### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute

over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. All justifiable inferences are to be drawn in the non-movant's favor and the evidence of the non-movant is to be believed. Id. at 255.

### B. Strict Liability Claims

#### 1. Design Defect

Because this is a diversity case, the Court applies the substantive law of Minnesota, the forum state. In re Levaquin Prods. Liab. Litig., 700 F.3d 1161, 1165 (8th Cir. 2012). Minnesota courts analyze design defect claims under a "reasonable care" balancing test. Holm v. Sponco Mfg., Inc., 324 N.W.2d 207, 213 (Minn. 1982). To prevail under the test, the plaintiff must show that: (1) the product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when the product left defendants' control; and (3) the defect was the proximate cause of the plaintiff's injuries. Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn. 1995).

Plaintiff alleges that J.D.O.'s dress was defective because of its extreme ignition and flammability characteristics, as well as the lack of an appropriate warning.[1] (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 14-15 [Doc. No. 27].) Plaintiff attributes the ignition and flammability characteristics of the dress to the combination of its predominantly cotton fiber content, the open and flowing design, and the loose fit. (Id. at 14.)

Defendants argue that there is no design defect because the dress met the governmental flammability standard under 16 C.F.R. § 1610; no safer alternative design

---

[1] The Court addresses whether the dress was defective for lack of an appropriate warning in the context of Plaintiff's failure to warn claims.

existed; and the risk of J.D.O.'s injuries is minimal. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 9-23 [Doc. No. 25].) Defendants also argue that Plaintiff cannot establish the proximate cause element, and regardless, Plaintiff is barred by her contributory negligence. (Id. at 23-25.)

### a. Defective Product

The parties agree that J.D.O.'s dress—both the shell and lining—met the federal flammability standard under 16 C.F.R. § 1610, also known as Commercial Standard ("CS") 191-53.[2] Defendants argue that the dress is not defective because it passed the federal testing regulations. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 15 [Doc. No. 25].)

The Minnesota Supreme Court rejected Defendants' very argument in Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727 (Minn. 1980), a case that considered whether cotton flannelette was unreasonably dangerous for use in children's sleepwear because of its highly flammable characteristics. In Gryc, a four year old girl, wearing loose-fitting 100% cotton flannelette pajamas, was watching television in the living room while food was

---

[2] Under the § 1610 test, fabric specimens measuring 6x3 inches are evaluated for ease of ignition by exposure to a small one-second flame. If test specimens do not ignite when subjected to the one-second flame, they automatically comply with the test standard and no further testing is required. If test specimens ignite within the one-second flame time, the time for the fabric to burn exactly five inches, at an angle of forty-five degrees, is measured. The fabric meets the rate of burn requirement if the five-inch burn time exceeds 3.5 seconds for plain-surfaced fabrics, and 4.0 seconds for fabrics with a raised fiber surface. (See Preliminary Expert Report of Gordon H. Damant at 13-14, Ex. D to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-3].)

All of the exemplar Gymboree shell and lining test specimens ignited in one second or less. (Id. at 17.) The shell fabric burned five inches within the range of 7.3 – 8.1 seconds, averaging 7.7 seconds. The lining fabric burned five inches within the range of 6.7 – 8.6 seconds, averaging 7.4 seconds. (Id.)

cooking on an electric stove in the kitchen. 297 N.W.2d at 729. Her mother set a timer above the stove and went to the basement to do laundry. Id. Shortly after the timer sounded, the girl went to the kitchen, moved a chair to the stove, climbed onto it, reached above the stove, and turned off the timer. Id. Her pajama top touched a lit burner and instantly ignited, resulting in second- and third-degree burns and scars to 20% of her body. Id. at 729-30. At trial, the defendant argued that the cotton flannelette was not unreasonably dangerous, in part because it complied with the Flammable Fabrics Act. Id. at 730. The jury nonetheless found the defendant liable and awarded compensatory and punitive damages, which the Minnesota Supreme Court affirmed. Id. at 729. The Minnesota Supreme Court agreed with the trial court's findings because substantial evidence established that

> the CS 191-53 test was not a valid indicator of the flammable characteristics of fabrics and did not take into account the uses to which a fabric would be put in determining its safety . . . It was shown that newspaper passed the CS 191-53 test with a 48-percent margin of safety . . . Furthermore, there was evidence that the test was adopted as a result of industry influence and, therefore, served to protect the textile industry rather than the public.

Id. at 733-34. It also noted the opinion of several courts that compliance with the CS 191-53 test did not preclude a finding that a product was unreasonably dangerous. Id. at 734. This Court finds similarities between the instant facts and those of Gryc, and, like other courts, declines to give conclusive weight to an industry standard. Accordingly, Defendants cannot avoid liability simply because J.D.O.'s dress met the federal flammability standard.

In addition, the Court respectfully disagrees with Defendants' position that there is no design defect because no safer alternative allegedly existed, and because the risk of burn

6

injury to children when calculated against the hours of wear is minimal. First, there is a genuine issue of material fact as to whether a safer alternative design existed.[3] Plaintiff submits expert testimony that

> There are several less dangerous alternatives such as using one hundred percent nylon or polyester which are widely employed in untreated fire safe children's sleepwear. Such garments are readily found in children's wear retail stores. Another possibility also available in children's retailers is flame retarded cotton, or permanently flame retarded (PFR) rayon to manufacture a similar dress. These choices too are readily available in children's sleepwear garments, e.g from Carter's for Kids and suppliers similar to Gymboree. The safe choices are more difficult to ignite, can self extinguish or are slower burning, have considerably less heat output while also being much easier to extinguish any flaming which might occur.

(Expert Report of Gordon H. Damant at 23, Ex. E to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-4].) If believed, such evidence might permit a jury to conclude that J.D.O.'s predominantly cotton, non-flame retardant dress was defective. Second, even if the risk of a child sustaining an injury such as J.D.O.'s is minimal, the parties appear to agree that such injuries nonetheless occur each year. The Court therefore finds Defendants' argument of *de minimis* injury to be insufficient for summary judgment.

Viewing the facts most favorably toward Plaintiff, as the Court must do on Defendants' motion for summary judgment, the record shows that a reasonable jury could find J.D.O.'s dress to be defective. For example, Plaintiff's expert, Steven Spivak, opines that J.D.O.'s dress had extreme ignition and flammability characteristics because of its predominantly cotton fiber content and its "open bottom, wide flowing skirt design," which

---

[3] The existence of a safer alternative design is not an element of a defective design claim, but it is a factor bearing on whether the product is unreasonably dangerous. Kallio v. Ford Motor Co., 407 N.W.2d 92, 97 (Minn. 1987).

7

"allows for a known fire 'chimney effect' and acceleration of flame growth."  (Final Report of Steven Spivak at 17, Ex. G to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-4].)  Mr. Spivak further states that

> Cotton fabric in loose fitting garments such as this Gymboree dress [is] especially dangerous due to their inherent design, easy ignition and high fire growth plus high heat transfer.  The published scientific literature ranks this type of fiber and fabric cotton, and dress design, coverage plus fit, among the highest level of heat transfer rate, fire risk and concomitant danger to the wearer when ignited.

(Id. at 18-19.)  In addition, Plaintiff's other expert, Gordon Damant, reported test results that the cotton Gymboree dress specimens ignited "in one second or less," whereas "many heavy weight cotton clothing fabric specimens [took] 5 seconds or more to ignite."  (Preliminary Expert Report of Gordon H. Damant at 17-18, Ex. D to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-3].)  And, as suggested by Mr. Damant, a safer alternative design possibly existed: alternate fabrics such as wool, nylon, and polyester, or flame-retarded fabrics.  (Id. at 42-45.)  These considerations are for a jury.

To be clear, the fact that J.D.O.'s dress was predominantly cotton, alone, is insufficient to overcome summary judgment, because flammability is an inherent feature of cotton upon contact with an ignition source.  If cotton clothing were considered defective simply because it is flammable, then all flammable products capable of causing injury would be defective.  But when the predominantly cotton fabric of J.D.O.'s dress is considered in combination with the open and flowing design, the lightweight quality of the cotton, and potentially safer alternative designs, a reasonable jury could conclude that J.D.O.'s dress was unreasonably dangerous.  On these grounds, summary judgment on

8

Plaintiff's defective design claims is inappropriate.

### b. Proximate Cause

Under Minnesota law, proximate cause is generally a separate factual issue to be resolved by a jury. Thompson v. Hirano Tecseed Co., Ltd., 456 F.3d 805, 812 (8th Cir. 2006). Proximate cause exists if the defendant's conduct, without intervening or superseding events, was a substantial factor in creating the harm. Id.

Defendants contend that Plaintiff cannot establish proximate cause because Ms. Oldenburg was aware of the dangers associated with fire before the incident; J.D.O. violated her mother's warning when she approached the candle; and Ms. Oldenburg disregarded all warnings on the matches, lighter, and candle before the incident. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 24-25 [Doc. No. 25].) Plaintiff responds that although J.D.O.'s contact with the candle flame was a cause of her injuries, the defective design of her dress— its rapid ignition and flame spread characteristics—was the "substantial direct cause of her injuries." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 14, 20-21 [Doc. No. 27].) In light of both parties' claims, the Court finds that there are genuine issues of material fact about the cause of J.D.O.'s injuries and whether the allegedly defective design was a substantial factor in creating the harm.

Therefore, the Court finds that genuine issues of material fact exist regarding (1) whether J.D.O.'s dress was unreasonably dangerous for its intended use, and (2) whether the alleged defect was the proximate cause of J.D.O.'s injuries. As a result, the Court denies Defendants' motion for summary judgment on Plaintiff's design defect claims.

## 2. Manufacturing Defect

Plaintiff asserts a manufacturing defect claim, but does not offer briefing in support for this issue. (Compl. ¶¶ 36-42 [Doc. No. 1].) Therefore, the Court grants summary judgment on this claim.

### C. Negligence Claims

Plaintiff's negligence claims sound in negligent design, negligent failure to warn, and negligent testing.

## 1. Negligent Design

In design defect cases, strict liability and negligence theories of recovery are merged. Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 622 (Minn. 1984). For the reasons discussed in Part III(B)(1), summary judgment is denied as to Plaintiff's negligent design claim.

## 2. Negligent Failure to Warn

Failure to warn and defective product design are separate causes of action. Holowaty v. McDonald's Corp., 10 F. Supp. 2d 1078, 1084 (D. Minn. 1998). A failure to warn claim under Minnesota law has the following elements: (1) the defendants had reason to know of the dangers of using the product; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries. Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir. 2004).

Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if "the user knows or should know of potential danger"—that is, if the alleged danger is open and obvious. See Holowaty, 10 F. Supp. 2d at 1084. As one Minnesota court commented, "[t]here is certainly no usual duty to warn the purchaser that a

knife or an axe will cut, a match will take fire, dynamite will explode, or a hammer may mash a finger." Peppin v. W.H. Brady Co., 372 N.W.2d 369, 375 (Minn. Ct. App. 1985) (quoting W. Prosser, Handbook of the Law of Torts, § 96 at 649 (4th ed. 1971)). Whether a duty to warn exists is a question of law for the Court. Germann v. F.L. Smithe Mach. Co., 395 N.W.2d 922, 924 (Minn. 1986).

Plaintiff argues that: (1) Defendants had actual and constructive knowledge of the dress's rapid ignition and flame spread characteristics; (2) the only warning on the dress stated that it was "Not Intended for Sleepwear"; (3) the defective dress was a proximate cause of J.D.O.'s injuries; and (4) Ms. Oldenburg and Ms. Oxley would have heeded an adequate warning about the dress's flammability had there been one. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 26-35 [Doc. No. 27].)

Defendants contend that Plaintiff cannot prove the causation element because Ms. Oldenburg was aware of the dangers posed by fire; and even if there were a warning on the dress, Plaintiff would not have acted differently. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 37-39 [Doc. No. 25].) Defendants also argue that the tag, "Not Intended for Sleepwear," on the dress made clear that the garment was not flame retardant. (Id. at 39.)

The Court finds that there are genuine issues of material fact as to Plaintiff's failure to warn claims. First is whether Defendants had reason to know of the dress's rapid ignition and flame spread characteristics. Plaintiff alleges that in 2003, Kelsay Parrott was injured in a nearly identical incident as J.D.O., resulting in litigation against Gymboree Corporation in the Northern District of Iowa. (Jan. 13, 2004, Compl. in Parrott v. Gymboree Corp., No. 04-cv-4004-DEO [Doc. No. 1].) Gordon Damant, an expert in both the Parrott case and the

11

instant one, states that the circumstances surrounding the burn injury to Ms. Parrott are "nearly identical" to those of J.D.O. (Final Report of Gordon H. Damant at 53, Ex. E to Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-4].) Mr. Damant claims that the similarities between the two cases include:

- **Age**: In each case, the children were approximately the same age (Parrott was four years old; Oldenburg was three years old).

- **Garment**: Lightweight loose and flowing sleeveless cotton dress. (Parrott – 100% cotton; Oldenburg – 99% cotton).

- **Marketer – Importer**: Gymboree.

- **Cause of ignition**: Small candle.

- **Circumstances**: Toddler girl burned at home with her mother present.

- **Mother**: Out of the room of ignition at the time. Parrott – folding clothes about 20 feet away. Oldenburg – using the bathroom down the hall.

- **Area of ignition**: Front of dress.

- **Flammability**: In accordance with 16 C.F.R. § 1610, each garment was considered "normal flammability" and had passed the federal government test for flammability.

- **Lack of warning**: In each case, the dress contained a sewn-in label that said nothing about flammability, but read in part: "Not Intended for Sleepwear."

- **Event**: Mother heard daughter screaming and ran to her, finding dress in flames.

- **Extinguishment**: Water in the bathroom.

- **Injury**: Extensive burns to torso and neck. (Parrott – 40% body surface area; Oldenburg – over 50% to 60% body surface area).

(See id. at 53-54.) Plaintiff also argues that Defendants knew of clothing-related burns through statistics compiled and issued by the federal government. (Pl.'s Mem. in Opp'n to

Defs.' Mot. for Summ. J. at 17-18 [Doc. No. 27].) Whether Defendants had reason to know of the ignition and flame spread characteristics of J.D.O.'s dress based on the Parrott litigation and the statistics compiled by the United States is a question for a jury.

A second issue of material fact is whether the warning, "Not Intended for Sleepwear," fell short of what was reasonably required. Defendants offer the opinion of their expert, Jane Welch, that to "an alert consumer willing to read this label, it should be clear that the garment was not flame-retardant and thus would perform as any other fabric in regard to ignition." (Report by Jane Welch, Ph.D. at 5, Ex. E to Defs.' Mot. for Summ. J. [Doc. No. 26-5].) Plaintiff, however, argues that the meaning of "Not Intended for Sleepwear," as it relates to flammability, is unclear. Plaintiff claims that neither Ms. Oldenburg nor Ms. Oxley knew that "Not Intended for Sleepwear" was a flammability warning. (Aff. of Amber Oldenburg ¶ 2, Ex. K to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5]; Aff. of Cynthia Oxley ¶ 4, Ex. L to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].) Plaintiff also provides the testimony of Terisa Wagner (Gymboree's District Manager for Southern Minnesota) and Kristi Meenan (sales clerk at the Gymboree store in Maple Grove, where J.D.O.'s dress was sold) about the "Not Intended for Sleepwear" tag:

A. Not intended for sleepwear.

Q. Do you understand what that means?

A. I understand what it means, yes.

Q. What does it mean?

A. Do not sleep in it.

> Q. Do you understand why you shouldn't sleep in it?
>
> A. No.

(Dep. of Terisa Wagner at 48, Ex. I to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].)

> Q. Does that phrase "not intended for sleepwear" mean anything to you other than what it says, not intended for sleepwear?
>
> A. No.
>
> Q. Is there any suggestion to you that that is somehow a warning to the customer that there is something dangerous about that dress?
>
> A. No.
>
> Q. And is there any suggestion in that phrase that you know of which would convey to a customer the suggestion that the dress is in some way flammable?
>
> A. No.
>
> Q. Has anyone ever suggested to you that that phrase is on there for anything regarding flammability?
>
> A. No.

(Dep. of Kristi Meenan at 51-52, Ex. J to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].) Plaintiff further claims that Gymboree uses "hang tags" to provide flammability information to sleepwear consumers, but provided no such information on J.D.O.'s dress. (Dep. of Michael Mayo at 109, 117, Ex. M to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-6].) Based on these facts, the Court concludes that a reasonable jury could find that the warning, "Not Intended for Sleepwear," did not disclose to a reasonable consumer the dress's rapid ignition and flammability characteristics in an

14

adequate fashion.

A third issue of material fact is whether the lack of an adequate warning caused J.D.O.'s injuries. Defendants argue that Plaintiff would not have acted any differently even if there had been a flammability warning on J.D.O.'s dress, citing Dr. Welch's testimony:

> A warning on such a product does not heighten safety-consciousness and is not a motivator to safe behavior. Human factors professionals have long known that the public is less likely to heed warnings on familiar products or products with which they have had repeated benign experiences. Ordinary daywear clothing is just such a product: very familiar and one with which very few people have had negative experiences. While wearers—or in the case of children, their parents—can be expected to understand that they should not bring a garment into contact with a source of ignition, they can also be expected to disregard a warning against such an act as stating the obvious.

(Report by Jane Welch, Ph.D. at 4, Ex. E to Defs.' Mot. for Summ. J. [Doc. No. 26-5].) Defendants also cite Plaintiff's testimony that if a warning label on clothing stated that it was flame retardant and listed the health risks of fire-retardant chemicals, she would not let her children wear the clothing. (Oldenburg Dep. at 126.) Plaintiff, however, presents Ms. Oldenburg's statement that had the dress included a warning about its ignition and flammability characteristics, she would have ensured that no ignition source was ever near J.D.O. when she wore the dress. (Oldenburg Aff. ¶ 3, Ex. K to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].) Ms. Oxley similarly confirms that had she seen such a warning, she would never have purchased the dress. (Oxley Aff. ¶ 4, Ex. L to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-5].) The credibility of Ms. Oldenburg and Ms. Oxley is for a jury to decide. As currently alleged, Ms. Oldenburg's and Ms. Oxley's statements raise a genuine issue of material fact on the causation element.

Finally, Defendants argue that Plaintiff's contributory negligence is a complete bar to her failure to warn claims. Defendants cite Ms. Oldenburg's testimony that she was aware of the dangers associated with fire before J.D.O.'s incident, and that she disregarded all warnings on the matches, lighter, and candle when she left her child unattended. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 42 [Doc. No. 25].) In contrast, Plaintiff contends that Ms. Oldenburg was not negligent because "reasonable persons routinely have unsupervised children in a home with ignition sources present." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 32 [Doc. No. 27].) Plaintiff also argues that then-three year old J.D.O. cannot be at fault as a matter of law. (Id.)

The relevant danger to be comprehended here is the rapid ignition and flame spread characteristics of J.D.O.'s dress. Given J.D.O.'s youth and inexperience, the Court finds that J.D.O. could not understand that her dress would ignite and burn so quickly upon contact with the candle flame. See Gryc, 297 N.W.2d at 743 (declining to find a four year old comparatively at fault where the danger to be comprehended was the highly flammable nature of her cotton flannelette pajamas upon contact with an electric burner). Therefore, J.D.O. is not negligent as a matter of law. As for any negligence on Ms. Oldenburg's part, this question is one properly before a jury.

In summary, there are genuine issues of material fact on Plaintiff's failure to warn claims. The record presents conflicting evidence of (1) whether Gymboree had reason to know of the dangers of J.D.O.'s dress; (2) whether the warning, "Not Intended for Sleepwear," was inadequate; (3) whether the lack of an adequate warning caused J.D.O.'s injuries; and (4) whether Ms. Oldenburg was negligent. The Court therefore denies

Defendants' motion for summary judgment on Plaintiff's failure to warn claims.

### 3. Negligent Testing

Minnesota law recognizes three causes of action based on negligence in products liability cases: negligent design, negligent manufacture, and negligent failure to warn. Kociemba v. G.D. Searle & Co., 707 F. Supp. 1517, 1527 (D. Minn. 1989) (citations omitted). Negligent failure to test is not an independent cause of action under Minnesota law. Id. at 1528. Rather, the duty to test is a "subpart of duties to design a product non-negligently, manufacture a product non-negligently, and provide adequate warnings of dangers associated with its use." Id.

The Court has considered Plaintiff's arguments that (1) the § 1610 standard is a meaningless test, and (2) Defendants provided paltry records of pre-manufacture testing done by Bureau Veritas under Defendants' direction. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 21-26 [Doc. No. 27].) The Court has also considered Defendants' position that (1) Steven Spivak, Plaintiff's expert, did not question the completeness or accuracy of Bureau Veritas' test results, and (2) the shell and lining exemplars passed the § 1610 test by a large margin. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 25-26 [Doc. No. 25].)

At trial, the parties may submit evidence of Defendants' compliance with the § 1610 standard, the purported inadequacy of this standard, and Bureau Veritas' records of pre-manufacture testing to support their positions on the negligent design and negligent failure to warn claims. Without more, however, such evidence is both insufficient to compel summary judgment for the defense or establish a breach of the duty required

under theories of negligent design and failure to warn. For example, Plaintiff presents test reports that the shell fabric failed on "dimensional stability" and "tear strengths." (Damant Dep. at 43, Ex. P to Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 28-7].) But no one articulates how the shell fabric's dimensional stability and tear strength relate to its ignition and flame spread—the characteristics at issue here. Plaintiff also argues that beyond these test results, nothing else from Bureau Veritas was disclosed, and Bureau Veritas supposedly "had no input into the use of the fabric it tested." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 26 [Doc. No. 27].) Plaintiff, however, needs to present more than an absence of evidence to establish a breach of duty.

To the extent that testing or a failure to test occurred—and that testing was or could have been relevant to the claims in this case—that evidence will be received at trial in support of either party's claims. But for purposes of this motion, a failure to test is not an independent cause of action.

### D. Breach of Implied Warranty of Merchantability

Plaintiff asserts a claim of breach of implied warranty of merchantability. (Compl. ¶¶ 69-75 [Doc. No. 1].) Defendants argue that this theory is preempted by strict liability, and regardless, a breach of warranty did not occur. (Defs.' Mem. in Supp. of its Mot. for Summ. J. at 43-44 [Doc. No. 25].)

Under Minnesota law, "[s]trict liability has effectively preempted implied warranty claims where personal injury is involved." Nimeth v. Prest Equip. Co., No. C1-93-685, 1993 WL 328767, at *1 (Minn. Ct. App. Aug. 31, 1993); see In re Shigellosis Litig., 647 N.W.2d 1, 11 (Minn. Ct. App. 2002) ("Strict liability and breach of implied warranty of

18

merchantability are closely related and involve similar proof; when an instruction on strict liability is stronger and broader under the case facts, it would be redundant and confusing to instruct on breach of implied warranty."). The Minnesota Practice Jury Instruction Guides further comment:

> Addition of implied warranty of merchantability instructions in design defect cases would only serve to add another overlapping theory of recovery that can only lead to confusion and inconsistent jury verdicts . . . . Therefore, the Committee is of the opinion that in design defect cases to which strict liability applies, it is inappropriate to submit jury instructions based on implied warranty of merchantability, although it may be justifiable, in an appropriate case, to submit instructions based upon express warranty or implied warranty of fitness for a particular purpose.

4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG 75.20 (5th ed. 2013). Accordingly, the Court finds that Plaintiff's strict liability claims subsume her breach of implied warranty claim. Summary judgment on the breach of implied warranty claim is therefore granted.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. No. 23] is **GRANTED IN PART** and **DENIED IN PART**.

Dated:     November 27, 2013          s/ Susan Richard Nelson
                                      SUSAN RICHARD NELSON
                                      United States District Court Judge